COMPAÑÍA MERCANTIL ARROYANA, Plaintiff and Appellee, *v.* HOME INSURANCE COMPANY, Defendant and Appellant.

No. 3539. Argued April 23, 1926.—Decided July 9, 1926.

624

*Henry G. Molina* and *Leopoldo Feliú* for the appellant. *E. H. F. Dottin* and *C. Domínguez Rubio* for the appellee.

Mr. Justice Franco Soto delivered the opinion of the court.

A stock of flour in sacks which the plaintiff had stored in a concrete building in Arroyo was insured by the defendant corporation through F. A. C. Hastrup, a broker. The amount of insurance was $15,000 for which five policies of $3,000 each were issued, but only policy No. 55750 issued on July 22, 1921, to expire three months thereafter is involved in this suit. The plaintiff had paid for it a premium of $22.50. It is alleged in the complaint that the insured flour was totally destroyed by a fire which occurred on August 15, 1921, in the soup-paste factory wherein it was stored.

The defendant set up as defenses that the flour was not the property of the plaintiff, but of the Kansas Milling Company; that the policy had been canceled, and denied that the plaintiff had complied with the conditions of the policy as necessary to give it a right of action for the loss caused by the fire.

The lower court rendered judgment for the plaintiff and against the defendant for the amount of insurance, $3,000.

The first question raised by the appellant is that the complaint was insufficient because its allegation "that the plaintiff has complied with each and all of the conditions of the said insurance policy" refers to conditions with which

the appellee should have complied, but that they are not recited nor mentioned in the complaint.

Section 127 of the Code of Civil Procedure reads as follows:

"In pleading the performance of conditions precedent in a contract, it is not necessary to state the facts showing such performance, but it may be stated generally that the party duly performed all the conditions on his part, and if such allegation be controverted, the party pleading must establish, on the trial, the facts showing such performance."

In setting up in the complaint the making of the contract of insurance, the amount of premium paid, the period of time during which it was to be in force, the amount of the insurance and the occurrence of the fire the plaintiff complied with the statute by alleging in general terms that he complied with all of the conditions of the policy.

One of the questions that goes to the bottom of the case and was argued at length by the parties refers to the construction of the contract and the ownership of the flour. The appellant contends that the insurance policy covered 1,300 bags of flour marked "Golden Seal" and "Lassens Perfection" which are distinct brands of the Kansas-Milling Company. The contention shows that the insurance was fixed and determined on an amount and quality of flour and was not a floating policy, as contended by the appellee. The appellant alleges also that the flour so insured was owned by the Kansas Milling Co. because the appellee only had the insured merchandise on deposit, in whose favor it appeared to be endorsed.

In referring to the property insured the policy says "on stock of flour in bags, while contained in the two-story," etc. According to the wording of the contract there is no doubt that the policy is a floating policy. However, the appellant's evidence undertook to prove that the intention of the parties to the contract was different in the sense that the agreement

626

was made on the basis of extending the policy to a specified amount of flour in bags, attempting to strengthen its position by alleging at the same time that the insured flour belonged to the Kansas Milling Co. and was held on deposit by the appellee until its purchase price should be paid. Both points were decided against the appellant by the court. The evidence was contradictory and an examination of it does not show that the conclusion of the court was erroneous.

■ It is contended that the trial court erred in not finding and holding that the policy was canceled.

The policy contains the following clause:

"9. The insurance may be terminated at any time at the request of the insured, in which case the company will retain the customary rate of insurance for a short time for the time the policy may have been in force. It may be terminated also at any time in the discretion of the company by giving notice thereof to the insured, in which case the company shall return on request the proportionate part of the premium corresponding to the period of time between its termination and the time for which the policy was to run."

In disposing of that contention the lower court said:

"The evidence shows that after the occurrence of an attempted fire (conato de incendio) early in the morning of August 15, 1921, in the paste factory the defendant notified the plaintiff that the insurance policy was canceled.

"The cancellation was, in our opinion, made too late, inasmuch as when notice thereof was given the fire had caused damages for which the insurer was liable."

However, it is alleged in the complaint that the insured merchandise was totally destroyed by a fire which occurred in the paste factory on August 15, 1921. As an attempt (conato) means an act begun but not consummated, there seems to be some variance between the averment of the complaint and the finding of the lower court. The evidence appears to explain that contradiction. José D. Padilla, president of the plaintiff corporation, was in San Juan on Monday night, August 15, 1921. Early in the morning he

called on F. A. C. Hastrup who, as he said, was not only his broker but also his personal agent, and notified him as representative of the insurance company of the fact that he had received a telephone call from Arroyo or Guayama informing him of the attempted fire (*conato*) in the paste factory. Padilla said that he would leave immediately for Arroyo and upon his arrival there would telephone Hastrup about what had occurred. Hastrup says that notwithstanding that promise he received no communication from Padilla and that being in Adjuntas two days later, or on August 17, 1921, he received a second notice of the total destruction of the insured merchandise. And on August 15th, the date on which he was notified of the attempted (*conato*) fire, Hastrup, by instruction of the insurance company, sent the appellee the following telegram:

"August 15, 1921.—Compañía Mercantil Arroyana, Arroyo.— Koerber just canceled your five policies in the sum of fifteen thousand dollars covering flour issued July 22, 1921, returning to me premium not earned. This of course does not affect validity of claim for damages caused by (*conato*) fire early this morning. I am awaiting complete details from you. Hastrup."

This notice was confirmed by a letter reading as follows:

"F. A. C. Hastrup, San Juan, Porto Rico.—August 15, 1921.— Compañía Arroyana, Arroyo, P. R.—Dear Sirs:—Early this morning your esteemed Mr. Padilla informed me that he had received a call from you informing him of a fire damaging the flour recently insured in the sum of $15,000 by the Home Insurance Co. of New York, represented by our mutual friends Koerber & Co.

"I immediately exchanged views with these agents and also with Macías, the representative of the beneficiaries, and both of them said to me that they were greatly surprised at the occurrence in view of the fact that yesterday was a Sunday on which the establishment must have been closed, making the occurrence inexplicable.

"In order to obtain more details about the fire I also telephoned Fantauzzi who informed me that the fire itself did not cause much damage, but that the water from the fire hose damaged a large number of the sacks of flour. I repeat to you my disagreeable aston-

ishment about this occurrence; particularly because a week or so ago Koerber called my attention to the fact that since the market value of flour had gone down the sum in which the insurance on this flour was taken was too high, it being worth not more than ten or eleven thousand dollars.

"I informed you by telegram that I had just received from Koerber notice of the cancellation of these five policies and a check covering the amount of the premium not earned thereon, which I herewith enclose. I urge you to sign these five 'lost policy release' and return them together with the policies to be also signed by Macías.

"I anxiously await your information about the occurrence and remain, Yours truly."

The check referred to, which appears to have been cashed by the appellee, and the endorsement thereon read as follows:

KOR BER & CO. INC.

"The National City Bank of New York.—San Juan Branch.—The National City Bank of New York.—No. 591 San Juan, P. R., August 15th, 1921.—Pay to the order of Cia. Mercantil Arroyana EIGHTY-SIX 25/100 U. S. Dollars.—KORBER & Co., INC., (Sgd.) W. Woods. U. S. $86.25/100.

"Endorsements: Pay to the order of the Royal Bank of Canada—Value on account. Arroyo, P. R., August 18, 1921. Compañía Mercantil Arroyana (Sgd.) José D. Padilla, President."

The appellee has attempted to explain its theory in the sense that the fire which caused the total loss of the insured merchandise was a continuation of the fire started on August 15th and not extinguished. However, there is no evidence to support that theory. That fact should have been clearly shown and the burden of proof was on the appellee. As we have seen, it gave no notice of the loss suffered as a consequence of the fire of August 15th. Far from doing so, Padilla was in Adjuntas at the time of the second fire. The appellee cashed the check on the day after the fire which destroyed all of the merchandise and thereby the appellee tacitly admitted receipt of the notice of cancellation in due

time, on a date sufficiently remote from the second fire, separate and independent from the first, without relation from cause to effect between the two occurrences. The cancellation, therefore, did not refer to the losses already suffered as a consequence of the first fire. On the contrary, the notice reserved the right to the appellee to claim such losses, and for this reason it can not be argued that the cancellation was made after the damage had been caused. However, the appellee based its complaint on the damages or losses caused by the second fire when the cancellation of the policy was already in full effect, and the court erred in giving effect to the policy after notice of its cancellation had been given.

On the other hand, assuming that the policy had continued in force, the appellant contends that the following conditions of the policy, among others, were not complied with by the appellee: The market value of flour and the quantity in storage on August 15, 1921.

The clause of the policy referring to the value of the destroyed property reads as follows:

"The Company hereby agrees with the insured that if the property described, or any part of it, is destroyed or damaged by fire . . . . the Company will pay or make good to the insured the value of the property so destroyed, or the amount of such damage thereto up to an amount not exceeding in respect to each or any of the several items above specified, the sum set opposite thereto respectively, nor exceeding the total sum of $3,000 nor in any case the amount of the insurable interest therein of the insured at the time of the fire."

Sections 397, 406 and 408 of the Code of Commerce provide:

"Art 397.—The guaranty of the underwriter shall only extend to the goods insured and in the building in which they were located, and his liability shall in no case exceed the amount at which the goods were valued or at which the risk was appraised."

"Art. 406.—The appraisement of the damage caused by the fire shall be made by experts in the manner established in the policy, by an agreement between the parties, in the absence of which, said

appraisement shall be made in accordance with the provisions of the Law of Civil Procedure.''

''Art. 408.—If the amount of loss suffered exceeds the amount of insurance carried, the insured shall be considered his own underwriter for this excess, and shall be responsible for the aliquot part of the losses and expenses.''

According to the terms of the policy the appellee bound itself to pay to the plaintiff the value of the property destroyed, not to exceed in any case the sum of $3,000 fixed as the maximum risk assumed by the insurance company. Therefore an appraisement of the fair market value of the insured property at the time of the fire had to be made. Hence the policy can not be included among those known as valued policies and the burden is on the insured to show the value of the flour in compliance with that part of the contract. The only evidence on that point was the testimony of José D. Padilla, president of the appellee corporation. He testified that the value of the flour on the date of the fire was $10.25, $10 and $9.75 a bag. He seemed to have reached this conclusion from the books of the corporation, for he testified that ''the total value of the flour destroyed by the fire, which was deposited in my warehouse, was, according to the books examined by me, $22,629.72,'' and whenever he referred to the value of the damaged property he based it on what appeared from the books or from the invoice price of his purchases. For example, when he was asked about the value of 588 bags which he had in stock on May 31, 1921, he answered: ''I must see the balance shown by the books . . . $5,940.05 according to the books.'' In appraising the stock which he had on June 30, 1921, he likewise said ''as shown by the books.''

He also estimated the value of the flour bought from the Kansas Milling Co. by referring to the invoice, for after having said that ''the invoice price of the 1,300 bags was $12,770,'' he added that ''the price agreed on with Macías for the said flour was the same as that stipulated in the

purchase contracts, or $12,770." His testimony may be summarized as follows: "On August 15th we had a stock of flour valued at $22,629.72. This flour was bought partly for cash and partly on account, as shown by the ledger. The said sum covers an item of 1,300 bags. . . ." In referring to this item he closed his testimony by saying: "The rate of $10 per bag is an estimate made in accordance with the purchase price appearing in the contract."

From this evidence it can not be said that the rule which seems to be unanimously upheld by the jurisprudence that the insured is entitled to recover the fair market value of the property destroyed has been followed. This rule is stated by the authorities as follows:

"A contract for insurance against fire is ordinarily a contract of indemnity and the insured is entitled to be put in the same condition pecuniarily in which he would have been had there been no fire; and except in the case of valued policies, or where there are statutory provisions limiting the amount of liability, the general rule is that in a case of total loss the insured is entitled to recover the fair cash or market value of the property at the time and place of the loss, up to but not exceeding the amount fixed in the policy, although it exceeds the limit of insurance as fixed by a by-law of the insurer. Under this rule the insured is not entitled to recover the cost of the property, as its actual value, although the original cost of the property may be considered as evidence of its value in connection with evidence as to depreciation; neither is the insurer's liability for the cash value affected by the fact that the insured had offered to sell the property for less than its actual value, nor by the fact that the amount of loss cannot be determined without difficulty, and is to some extent a matter of estimate. The cash value is to be estimated at the time of the loss and not at the time the property is exposed to danger by the outbreak of the fire." 26 C. J., sec. 450, pp. 351–2.

In section 478 of 14 R.C.L. p. 1304, this rule is expressed as follows:

"The measure of recovery for the loss of goods insured against fire is the market or cash value of the goods at the time and place of the fire."

632

It need not be said that the loss alleged to have been caused by the fire has not been proved as required by the contract of insurance and the jurisprudence, and the lower court erred in finding that the evidence was sufficient on this point.

The appellant contends that in disregard of the terms of the policy the evidence did not establish the quantity of flour which the appellee had in stock on August 15, 1921.

On this point the appellant refers to the clause in the insurance contract which is generally known as the "iron-safe clause," which reads as follows:

"1st.—The insured shall make an itemized inventory of stock insured at least once in each year, and unless such inventory has been made within twelve months prior to the date of this policy one shall be taken in detail within thirty days of the issuance of this policy, or this policy shall be null and void from such date, and upon demand of the Assured the unearned premium, from such date shall be returned.

"2nd.—The Assured will keep a full set of books which shall clearly and plainly present a complete record of business transacted, including all purchases, sales, and shipments both for cash and credit from date of inventory as provided for in the first section of this clause and during the continuance of this policy.

"3rd.—The Assured shall keep such books and inventory and also the last preceding inventory, if such has been taken, securely locked in a fireproof safe at night and at all times when the building mentioned in this policy is not actually open for business; or, failing in this, the Assured shall keep such books and inventories in some place not exposed to a fire which would destroy the aforesaid building.

"In the event of failure to produce such set of books and inventories for the inspection of this Company, this policy shall become null and void, such failure constituting a perpetual bar to any recovery thereon, and no suit or action at law shall be maintained thereon for any loss or damage under this policy."

The evidence for the appellee showing the stock on hand at the time of the fire consisted in the testimony of José D. Padilla, based on the entries made in the ledger, which was the only book produced in evidence. The appellant objected to the admission of this book on the ground that it had been

kept in an irregular manner, but the reason set forth referred rather to its probative value than to its admissibility. *Porto Rican American Tobacco Co.* v. *Canel,* 32 P.R.R. 509.

The testimony of Padilla on the stock of flour was as follows: "I can not answer as to the exact quantity of flour which the firm had in the paste factory because that can be shown only by the books. Nor can I state, even with the books before me, what was the approximate quantity of flour on hand at the end of January, 1921." The witness then explained the difficulty of keeping an exact account of the transactions, saying that it was customary to enter the transactions in memorandum books which were burned by the fire, from which extracts were made weekly or monthly and transferred to the books. However, the witness contradicted himself by saying: "In short, an exact record of all of the merchandise going into the establishment was kept; . . . that such a record could be carried because there were books and note-books and that therefore the bags in stock on any day could be determined." After this statement the following occurred: "Q.—Tell the court the number of bags in stock on January 31st. A.—I can not say because the note-books showing it were burned. The ledger contains a summary; but those to which you refer contain the details. Q.—Did not you keep a special book showing the flour in stock? A.—I kept notes thereof. For example, if in February, 1921, small or large quantities of flour were received record thereof was not entered on the same date because there was no obligation to do so, it being in the discretion of the manager to wait till greater quantities could be entered . . . Flour could be received without keeping record thereof in the ledger."

The witness testified that he could not determine even approximately the flour in stock in January, 1921, or in February, March or April. He could not even make an

estimate of the flour on hand in May, except on the last day of that month. From this date the accounts appear to have been kept more regularly. But in spite of this not all of the 1,300 bags of flour purchased from the Kansas Milling Co. were entered in the account of the ledger known as "Stock on hand in the paste factory" on July 31, 1921. Record of part of it was made in August, 1921. If this is so, how is it possible to conclude that the sole evidence of an irregularly kept ledger, wherein appeared records of transactions not made, showed conclusively the stock on hand at the time and place of the fire? If, as the appellee alleged and the lower court held, the insurance policy involved was not a valued but a floating policy, a daily account of the purchases and sales of the flour should have been kept. And more so when the industry in which the appellee was engaged required a continuous movement of that article used in the elaboration of paste and bread, the buying and selling of which formed part of the particular business in which Padilla, president and manager of the plaintiff corporation, was engaged.

A complete record of the business transacted and of the stock of flour on hand at any time was not shown by the appellee. A similar clause requiring a set of books in which all of the business transacted should appear, including all purchases and sales both for cash and on credit, and the last inventory taken of the business, was construed in the case of *Rodríguez* v. *U. S. Fire Ins. Co.*, 34 P.R.R. 370, wherein it was held that the evidence introduced, which was more or less the same as that in this case, was insufficient. A sound and reasonable interpretation of the same clause is to be found in *Home Insurance Co. of New York* v. *Williams*, 237 Fed. 171, 176, wherein the doctrine laid down is as follows:

"The iron safe clause obligated the insured to keep such a set of books as would enable the insurer to determine from the books

and papers submitted to him with reasonable certainty the stock of goods on hand at the time of the fire without recourse to oral testimony except as to the method of keeping said books.''

In the case of *Compañía L'Unión de París* v. *Goldsmith*, 8 Fed. Rep. (2nd Series) 137, the Circuit Court of Appeals for the First Circuit, in referring to a denied instruction that the ''iron safe clause'' was valid and binding on the assured, said:

''One of the requested instructions, the denial of which is assigned as error, was:

'' 'I charge you that the ''iron safe clause,'' contained in Exhibits A and B for the defendant, is one of the valid and binding obligations on the part of the insured, the plaintiff; and that you can not find a verdict for the plaintiff, unless you should find first from the evidence before you that there has been a substantial compliance with each and every one of the requirements and conditions of the said ''iron safe clause.'' Refused. Defendant excepts. A.F.O'.'

''This instruction should have been given, and there was error in the refusal to give the same.''

In the case of *Coggins* v. *Aetna Ins. Co.*, 8 L.R.A. (N. S.) 839, which seems to be very similar, and wherein the insured could not determine from the books the stock on hand at the time of the fire, the Supreme Court of North Carolina said:

''There has never been any inventory taken of the goods comprising the stock of this Erastus store, the one covered by the policy. There is not now, and has never been, any data from which such an inventory could be reasonably approximated. The plaintiff himself, testifying to this question, very correctly and properly said: 'No, I do not know how much hardware, groceries, and shoes I had.' . . . . The court was right, therefore, in holding that, on the evidence of plaintiff, there had been a breach of the first stipulation in the 'iron-safe clause.' ''

Applying the same doctrine, it may be concluded that one of the most essential conditions of the policy, whose noncompliance bars any action on the part of the assured, has not been performed, inasmuch as the evidence gave no ac-

curate idea of the stock of goods on hand at the time of the fire.

These conclusions having been reached, it is not necessary to discuss the other questions raised by the appellant.

For the foregoing reasons the judgment appealed from should be reversed.